No. 24-30272

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

ANNE WHITE HAT; RAMON MEJÍA; KAREN SAVAGE; SHARON
LAVIGNE; HARRY JOSEPH; JOHN LAMBERSTON; PETER AASLESTAD;
THEDA LARSON WRIGHT; ALBERTA LARSON STEVENS; JUDITH
LARSON HERNANDEZ; RISE ST. JAMES; 350 NEW ORLEANS; and
LOUISIANA BUCKET BRIGADE,

*Plaintiffs – Appellants,*

v.

ELIZABETH B. MURRILL, in her official capacity as Attorney
General of Louisiana; M. BOFILL DUHÉ, in his official capacity
as District Attorney of the 16th Judicial District Attorney's
Office; BECKET BREAUX, in his official capacity as Sheriff of
St. Martin Parish;

*Defendants – Appellees.*

---

On appeal from United States District Court for the Western District of Louisiana,
Case No. 6:20-CV-983

---

## APPELLANTS' OPENING BRIEF

---

<table>
<tr><td>

William P. Quigley
Loyola University College of Law
7214 St. Charles Ave.
New Orleans, LA 70118

</td><td>

Pamela Spees
Astha Sharma Pokharel
Baher Azmy
CENTER FOR
CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

</td></tr>
</table>

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## A. Plaintiffs-Appellants
1. Anne White Hat
2. Ramon Mejía
3. Karen Savage
4. Sharon Lavigne
5. Harry Joseph
6. John Lambertson
7. Peter Aaslestad
8. Theda Larson Wright
9. Albert Larson Stevens
10. Judith Larson Hernandez
11. RISE St. James
12. 350 New Orleans
13. Louisiana Bucket Brigade

## B. Attorneys for Plaintiffs-Appellants
1. Pamela C. Spees
2. Astha Sharma Pokharel
3. William P. Quigley

## C. Defendants-Appellees
1. Louisiana Attorney General Elizabeth Murrill
2. St. Martin Parish Sheriff Becket Breaux
3. 16th Judicial District Attorney Bofill Duhé

**D. Attorneys for Defendants-Appellees**

1. Ryan Seidemann (Murrill)
2. Cheryl Sibley McKinney (Murrill)
3. Ryan Stephen Montegut (Murrill)
4. Ralph R. Alexis, III (Duhe)
5. Corey Daniel Moll (Duhe)
6. Glenn B. Adams (Duhe)
7. Patrick Bayard McIntire (Breaux)

Undersigned counsel also certifies that RISE St. James, 350 New Orleans, and Louisiana Bucket Brigade have no parent corporation, and that no publicly held company holds 10% or more of the stock of RISE St. James, 350 New Orleans, and Louisiana Bucket Brigade.

/s/Pamela C. Spees
Pamela C. Spees

**REQUEST FOR ORAL ARGUMENT**

Pursuant to 5th Cir. R. 28.2.3, Plaintiffs-Appellants respectfully suggest that oral argument would be useful to assist the court in the disposition of the complex questions in this case. Plaintiffs-Appellants respectfully request oral argument for this appeal.

# TABLE OF CONTENTS

JURISICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................1

STATEMENT OF THE CASE...........................................................2

    A. Introduction ......................................................................2

    B. Statement of Facts ............................................................4

    C. Proceedings Below..........................................................13

    D. The District Court's Decision .........................................16

SUMMARY OF THE ARGUMENT ....................................................19

ARGUMENT ...............................................................................22

  I. STANDARD OF REVIEW.......................................................22

  II. THE STATUTE APPLIES TO ALL FORUMS, AND ALSO VIOLATES
     THE DUE PROCESS AND FIRST AMENDMENT RIGHTS OF
     PRIVATE LANDOWNERS. ................................................23

  III. DUE PROCESS: THE STATUTE IS VOID FOR VAGUENESS.................26

    A. The District Court Applied the Wrong Standard to Assess Vagueness in
      Criminal Statutes. ........................................................26

    B. The Law Does Not Provide Adequate Notice of Prohibited Conduct
      and an Instruction to Leave Cannot Cure It..................................28

    C. The Law Does Not Establish Minimal Guidelines for Law Enforcement
      and Encourages Arbitrary and Discriminatory Enforcement. .......................32

  IV. FIRST AMENDMENT: THE DISTRICT COURT ERRED IN
     DISMISSING PLAINTIFFS' FIRST AMENDMENT CLAIMS
     BECAUSE THE STATUTE IS SUBSTANTIALLY OVERBROAD
     AND IS IMPERMISSIBLY CONTENT-BASED...........................................34

    A. The Statute Is Substantially Overbroad.......................................34

    B. The Statute Is Impermissibly Content-Based...........................................37

V. ARRESTEE PLAINTIFFS' AS-APPLIED CHALLENGE IS NOT MOOT. ...................................................................................43

VI. THE DISTRICT COURT ERRED IN DISMISSING THE ATTORNEY GENERAL AS A DEFENDANT BECAUSE THE OFFICE RETAINS SUFFICIENT CONNECTIONS TO, AND ENFORCEMENT AUTHORITY OVER, THE STATUTE. ..............................................44

VII. ALL PLAINTIFFS HAVE STANDING TO CHALLENGE THE STATUTE. ..................................................................................47

A. The Landowner Plaintiffs Have Suffered Injuries-in-Fact. ........................48

B. All Organizational and Community Advocate Plaintiffs Have Standing. ...52

CONCLUSION ....................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ........................................................................ 55
*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ........................................................................ 26
*Barilla v. City of Houston*,
  13 F.4th 427 (5th Cir. 2021) ......................................................... 50
*Black Warrior Elec. Membership Corp. v. Miss. Power Co.*,
  413 F.2d 1221 (5th Cir.1969) ....................................................... 22
*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ......................................................... 49
*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984) ........................................................................ 22
*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ........................................................................ 37
*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub.*,
  457 F.3d 376 (4th Cir. 2006) ......................................................... 38
*CISPES v. F.B.I.,* 770 F.2d 468 (5th Cir. 1985) ....................... 31, 34, 39
*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019) ......................................................... 44
*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ............................................................... 37, 40, 41
*City of Chicago v. Morales*,
  527 U.S. 41 (1999) ..................................................... 20, 26-27, 30, 32
*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ................................................................. 21, 38
*Cox v. Louisiana*,
  379 U.S. 536, 557-58 (1965) .......................................................... 38
*Doe v. Jindal*,
  2011 WL 3664496 (M.D. La. Aug. 19, 2011) .............................. 46
*Ex Parte Young*,
  209 U.S. 123 (1908) .................................................................. 44-45
*Fabric v. Provident Life & Accident Ins. Co.*,
  115 F.3d 908 (11th Cir. 1997) ....................................................... 22
*Fed. Election Comm'n. v. Wis. Right To Life, Inc.*,
  551 U.S. 449 (2007) ........................................................................ 43

*Ferguson v. Estelle,*
  718 F.2d 730 (5th Cir. 1983).......................................... 27
*Ford Motor Co. v. Tex. Dep't of Transp.,*
  264 F.3d 493 (5th Cir. 2001).......................................... 24
*Forsyth Cnty., Georgia v. Nationalist Movement,*
  505 U.S. 123 (1992)................................................ 38, 39
*Gooding v. Wilson,*
  405 U.S. 518 (1972).................................................... 55
*Grayned v. City of Rockford,*
  408 U.S. 104 (1972).................................................... 31
*Hill v. Colorado,* 530 U.S. 703 (2000) ........................... 31, 37
*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995)................................................... 51
*Imani v. City of Baton Rouge,*
  614 F. Supp.3d 306 (M.D. La. 2022)................................. 24
*In re Louisiana Crawfish Producers,*
  852 F.3d 456 (5th Cir. 2017)......................................... 22
*K.P. v. LeBlanc,*
  627 F.3d 115 (5th Cir. 2010)......................................... 45
*Kolender v. Lawson,*
  461 U.S. 352 (1983).............................................26-27, 32
*Lanzetta v. New Jersey,*
  306 U.S. 451 (1939).................................................... 29
*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992).................................................... 47
*McCullen v. Coakley,* 573 U.S. 464 (2014) ........................ 35
*McDonald v. Longley,*
  4 F.4th 229 (5th Cir. 2021) ......................................... 49
*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974).................................................... 52
*Moody v. NetChoice, LLC,*
  144 S. Ct. 2383 (2024)............................................. 48, 51
*Moore v. Louisiana Bd. of Elementary and Secondary Educ.,*
  743 F.3d 959 (5th Cir. 2014)......................................... 21
*NAACP v. Button,*
  371 U.S. 415 (1963)............................................ 26, 36, 42
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983).................................................... 25
*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992)................................................... 42

*Reed v. Town of Gilbert, Arizona*,
   576 U.S. 155 (2015) ................................................................. 38, 41

*Reynolds v. Middleton*,
   779 F.3d 222 (4th Cir. 2015)...................................................... 35, 36

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ........................................................................ 49

*Schalk v. Gallemore*,
   906 F.2d 491 (10th Cir. 1990)........................................................ 22

*Sierra Club v. Cedar Point Oil Co. Inc.*,
   73 F.3d 546 (5th Cir. 1996)............................................................ 23

*Simi Inv. Co. v. Harris Cnty., Texas*,
   236 F.3d 240 (5th Cir. 2000) ......................................................... 49

*Smith v. Goguen*,
   415 U.S. 566 (1974) ....................................................................... 26

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020, revised Oct. 30, 2020) ......................... 48

*Steffel v. Thompson*,
   415 U.S. 452 (1974) .................................................................. 50, 54

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................48, 50-51

*Union Elec. Co. v. S.W. Bell Tel. L.P.*,
   378 F.3d 781 (8th Cir. 2004)......................................................... 22

*United Food & Com. Workers Local 99 v. Bennett*,
   934 F. Supp. 2d 1167 (D. Ariz. 2013)............................................ 39

*United States v. Stevens*,
   559 U.S. 460 (2010) .......................................................... 20, 35, 37

*Washington Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019)..................................................... 25, 48

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ......................................................................... 37

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ....................................................................... 41

*Wright v. Georgia*,
   373 U.S. 284 (1963) ....................................................................... 30

*Yumilicious Franchise, L.L.C. v. Barrie*,
   819 F.3d 170 (5th Cir. 2016).......................................................... 23

# Statutes

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 2106 ............................................................................... 22

28 U.S.C. §§ 1331, 1343, 2201, 2202 ................................................. 1

42 U.S.C. §§1983 and 1988 ............................................................... 1

La. Code Crim. Proc. Ann. art. 62 ................................................... 45

La. R.S. 14:61 ..........................................................................*Passim*

La. R.S. 14:61(A)(1) ............................................................. 6, 17, 29

La. R.S. 14:61(A)(3) ..................................................................*Passim*

La. R.S. 14:61(A)(4) ............................................................. 6, 17, 29

La. R.S. 14:61(B)(1) ............................................................. 5, 29, 50

La. R.S. 14:61(B)(3) ............................................................................ 6

La. R.S. 14:61(D)(1) ....................................................................10, 38

La. R.S. 14:61.1 ............................................................................... 10

La. R.S. 14:63.3 ............................................................................... 12

La. R.S. 29:725.1 ............................................................................. 45

La.C.Cr. P. Art. 61 ........................................................................... 45

La.C.Cr.P. Art. 62(A) .................................................................. 8, 45

# Constitutions

U.S. Const. Amend. I ..................................................................*Passim*

U.S. Const. Amend. XIV (Due Process Clause) ..........................*Passim*

La. Const. Art. IV, Sec. 8 ............................................................... 45

# Rules

Fed. R. App. P. 4(a)(1)(A) ................................................................ 1

Fed. R. Civ. P. 56(f) ....................................................................... 16

## JURISDICTIONAL STATEMENT

The Western District of Louisiana had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202, and 42 U.S.C. §§1983 and 1988. This Court has jurisdiction over this appeal from the district court's final judgment entered on March 28, 2024, pursuant to 28 U.S.C. § 1291. ROA.2018. On April 22, 2024, Plaintiffs filed a timely notice of appeal from the court's entry of final judgment. ROA.2050. Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did the district court err in dismissing Plaintiffs' Due Process claim that La. R.S. 14:61(A)(3) is void for vagueness by failing to give the average person and officer alike adequate notice of the vast areas around pipelines subject to the Statute's prohibition?

2.  Did the district court err in dismissing Plaintiffs' First Amendment claims in ruling that the Statute was neither substantially overbroad nor content-based so as to trigger strict scrutiny, and in dismissing the claims even under intermediate scrutiny?

3.  Did the district court err in dismissing the Attorney General as a defendant on the basis of sovereign immunity even though the Attorney General has supervisory authority over the enforcement of the Statute?

4.  Did the district court err in dismissing the Organizational, Community Advocate, and Landower Plaintiffs for lack of standing when they have amply shown injuries-in-fact that are traceable to Defendants and redressable by the court?

5.  Did the district court err in dismissing Arrestee Plaintiffs' claims as moot?

## STATEMENT OF THE CASE

### A. Introduction

Plaintiffs, including private landowners, challenge amendments passed by the Louisiana Legislature in 2018 which added pipelines of all kinds and sizes to La. R.S. 14:61[1] ("the Statute") – the State's law prohibiting "unauthorized entry of a critical infrastructure" – without defining the area around these pipelines that is to be covered by the law. In contrast to the other well-defined and readily ascertainable forms of critical infrastructure protected from trespass under the Statute, this incorporation of pipelines, without limitation or guidance as to what constitutes a "premises" of a pipeline, renders La. R.S. 14:61(A)(3) unconstitutionally vague in violation of due process. In addition, evidence showed that the amendments originated in response to increasing expressive activity critical of the environmental destruction pipelines can cause, and therefore represented a form of viewpoint

---

[1]    The Statute was also amended in 2024 but the changes did not affect the language challenged in this matter.

discrimination that is presumptively unconstitutional under the First Amendment. While appearing to protect expressive activity in response to concerns raised by opponents of the bill, the law included a purported carveout which conferred improper discretion to law enforcement to determine what and where such expressive activity pertains to "legitimate matters of public interest." These vices combine to further render the law overbroad in violation of the First Amendment in that even if the amendments are deemed to protect against damage to pipelines, the sweep of the statutory restrictions on protected expressive activity far exceeds any legitimate regulatory purpose, rendering the Statute unconstitutionally overbroad.

Plaintiffs include three individuals arrested for allegedly violating the law in the weeks after the pipeline amendments went into effect (Anne White Hat, Karen Savage, and Ramon Mejía – "Arrestee Plaintiffs"), five landowners with pipelines running through their property where the arrested Plaintiffs were charged with violating the law (Katherine Aaslestad,[2] Peter Aaslestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez – "Landowner Plaintiffs"), as well as three organizations (350 New Orleans, Louisiana Bucket Brigade and RISE St. James – "Organizational Plaintiffs") and two other individuals (Sharon Lavigne and Harry Joseph – "Community Advocate Plaintiffs") chilled in the exercise of their First Amendment rights by the enactment of the amendments.

---

[2] Ms. Aaslestad is now deceased, and Mr. John Lambertson has been substituted.

Notably, just weeks after the amendments went into effect, the Arrestee Plaintiffs were arrested on land where a pipeline company was trespassing and illegally constructing its pipeline, and there was no legal, valid "right-of-way." The Plaintiffs were there to protest and call attention to the company's illegal presence on the site and the arresting officers were being paid by a private security firm providing security services for the company.

## B. Statement of Facts

### 1. Facts Demonstrating Vagueness Relevant to Due Process Claims

In 2018, at the behest of the Louisiana Mid-Continent Oil and Gas Association ("LMOGA") and in response to increasing protests about the environmental harms associated with pipelines, ROA.1001-1011, the Louisiana Legislature amended La. R.S. 14:61, to add pipelines to the definition of "critical infrastructure," and it did so without limitation or guidance as to what areas around pipelines constitute a "premises" subject to the law's prohibition. The amendment's inclusion of "pipelines" within categories of "critical infrastructure" impacted section (A)(3) of the Statute which punishes "[r]emaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person." But nowhere do these provisions define what "premises" means when it comes to pipelines nor identify who constitutes a "custodian" or "authorized person."

In the Statute prior to the 2018 amendment, it was clear to a reasonable person (or officer) what areas were subject to the trespass prohibition because all the "premises" then covered by the pre-2018 prohibition made it clear that such facilities would be visible and obvious. The prohibition applied to:

> [A]ny and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, and trucking terminals.

La. R.S. 14:61(B)(1) (definition of critical infrastructure prior to 2018 amendment). In the pre-2018 Statute, therefore, all prohibited premises were easily discernible because they are visible, above ground, clearly demarcated and/or enclosed by physical barriers. By operation of the 2018 amendment, by contrast, (which added the term "pipelines" to the text in between terms "switching yards" and "trucking terminals") there is no comparable – nor discernible – limitation or guidance so as to understand whether someone is upon the "premises" of a pipeline, which are typically underground and often not discernibly demarcated.

The 2018 amendment as it affected section (A)(3)[3] also stands in contrast to the other provisions of the Statute which prohibit unauthorized entry onto premises of critical infrastructure of a kind that readily signal to the public the areas that are off-limits.

For example, section (A)(1) prohibits:

> The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure *that is completely enclosed by any type of physical barrier.*

La. R.S. 14:61(A)(1) (emphasis added).

Similarly, section (A)(4) prohibits:

> The intentional entry into a restricted area of a critical infrastructure **which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier** when the person is not authorized to enter that restricted or limited access area.

La. R.S. 14:61(A)(4) (emphasis added).

The amendments do include a separate definition of "pipeline," defining them as "flow, transmission, distribution, or gathering lines, *regardless of size or length,* which transmit or transport oil, gas, petrochemicals, minerals, or *water* in a solid, liquid, or gaseous state." La. R.S. 14:61(B)(3) (emphasis added). But this

---

[3] Similarly, section A(2) does not mention types of infrastructure, as it merely prohibits the "use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure." Like subparagraphs (A)(1) and (4), this provision is not at issue in this case.

specification of what constitutes a pipeline did not cure the fundamental vagueness concerns because in most cases, it is not readily observable to an average person who may be accused of remaining upon it without permission, nor a law enforcement officer required to enforce it. And, again, the Statute does not define what constitutes the "premises" of an underground pipeline.

There are over 125,000 miles of oil and gas pipelines alone in Louisiana, without counting the unknown mileage of pipelines carrying water or other minerals that are also included. ROA.999, 1011 [¶¶1, 41].[4] Many of these are underground and invisible, often not clearly marked, ROA.999-1000 [¶¶1-9], and given their proliferation, including of water pipelines, they run through private and public land, structures, water ways, wetlands, under public streets, sidewalks, parks, and other public spaces. Thus when pipelines, of any size or length, including those carrying water, are factored in, the post-2018 vagueness of the Statute becomes even more pronounced as these pipelines are virtually everywhere – in and through public and private structures and spaces of all kinds.

By adding pipelines to the definition of critical infrastructure in such as an open-ended way, the amendments turned what had been a clearly delineated law applicable to obvious and confined facilities to an amorphous and confusing statute

---

[4] Paragraph references in this section are to paragraphs in Plaintiffs' Statement of Undisputed Facts in support of their Motion for Summary Judgment. ROA.997. Plaintiffs addressed the basis for admissibility of these public records and other exhibits referenced in their Statement of Facts in briefing below. ROA.1746-1749.

applicable to vast and undefined areas, exposing individuals to up to five years' imprisonment for remaining on such indeterminate "infrastructure" after being forbidden by an "owner, lessee, or custodian" or "any other authorized person" in violation of section A(3). The Statute also does not define sufficiently who constitutes a "custodian" or "authorized person" for purposes of forbidding persons from the undefined premises of a pipeline.

Defendants themselves have presented real-world proof of these defects by offering interpretations of the Statute that differ dramatically in scope in their briefing before the court below. The Louisiana Attorney General, who wields supervisory authority over district attorneys,[5] has argued that "premises" for purposes of section (A)(3) means a "tract of land" where a "pipeline exists or does not." ROA.164. By contrast, the District Attorney has argued that the law was not vague because it applied to critical infrastructure "completely enclosed by any type of physical barrier" – a provision of the Statute not challenged in this case – or because it could be determined by reference to an expropriation judgment setting out a pipeline's right-of-way. ROA.284, 739-740. A pipeline right-of-way *through* a tract of land differs greatly from a tract of land, and these differing interpretations from high-ranking lawyers responsible for the prosecution of violations of criminal law as in the case of the District Attorney, or for supervising the prosecutors as in

---

[5]   LA. CODE CRIM. PROC. ANN. art. 62.

applicable to vast and undefined areas, exposing individuals to up to five years' imprisonment for remaining on such indeterminate "infrastructure" after being forbidden by an "owner, lessee, or custodian" or "any other authorized person" in violation of section A(3). The Statute also does not define sufficiently who constitutes a "custodian" or "authorized person" for purposes of forbidding persons from the undefined premises of a pipeline.

Defendants themselves have presented real-world proof of these defects by offering interpretations of the Statute that differ dramatically in scope in their briefing before the court below. The Louisiana Attorney General, who wields supervisory authority over district attorneys,[5] has argued that "premises" for purposes of section (A)(3) means a "tract of land" where a "pipeline exists or does not." ROA.164. By contrast, the District Attorney has argued that the law was not vague because it applied to critical infrastructure "completely enclosed by any type of physical barrier" – a provision of the Statute not challenged in this case – or because it could be determined by reference to an expropriation judgment setting out a pipeline's right-of-way. ROA.284, 739-740. A pipeline right-of-way *through* a tract of land differs greatly from a tract of land, and these differing interpretations from high-ranking lawyers responsible for the prosecution of violations of criminal law as in the case of the District Attorney, or for supervising the prosecutors as in

---

[5]   LA. CODE CRIM. PROC. ANN. art. 62.

the case of the Attorney General, demonstrate the Statute's vagueness. Contradictory testimony of arresting officers in this case also proves that the Statute does not give clear enough guidance to law enforcement. ROA.1024-1026 [¶¶118-128]

## 2. Facts Demonstrating Violation of the First Amendment

In 2018, in the midst of high-profile protests drawing local and national media attention against the controversial Bayou Bridge Pipeline ("BBP"), the General Counsel of the Louisiana Mid-Continent Oil and Gas Association (LMOGA) drafted and pushed legislation aimed at deterring such protests. ROA.1001-1003 [¶¶10-20, 24-26]. Industry spokespeople likewise applauded the law as a way of countering pipeline protests. ROA.1002-1003 [¶¶21-23]. When opponents of the bill expressed concern about its apparent targeting of protest activity, LMOGA and the legislation's sponsors sought to assure lawmakers that the proposed bill would not affect protests but was instead aimed at preventing physical damage to pipelines and other infrastructure and that causing damage was necessary to "trigger" the law. ROA.1005-1006 [¶¶ 33-35]. The assurances proved to be misleading and deflective because the resulting law makes no mention of physical damage, nor does it require a showing of damage or even an intent or attempt to do damage. It also contains no *scienter* requirement. La. R.S. 14:61(A)(3) simply prohibits remaining after being forbidden from undefined areas around the vast network of pipelines in Louisiana.

Instead, a provision of the legislation regarding damage was split off into a *separate* statute to prohibit and punish damage to pipelines and other forms of critical infrastructure under La. R.S. 14:61.1, leaving the challenged Statute without any damage requirement or limitation.

Also, ostensibly reacting to concerns about the bill's implications for protest activity, the Statute includes a provision which states it should not be construed to apply to or prevent "[l]awful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views *regarding legitimate matters of public interest*, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana . . . ." La. R.S. 14:61(D)(1) (emphasis added). This carveout thus identified certain protected categories of speech in the law while leaving unbridled discretion in the hands of law enforcement officers or other authorized persons to determine what constitutes "legitimate matters of public interest" – or what "ideas or views" are "legitimate" or not, and thus subject to criminal penalty.

### 3. Facts Regarding Plaintiffs' Standing

In early 2018, prior to the passage of these amendments to the Statute, representatives of the Bayou Bridge Pipeline company ("BBP") knowingly trespassed onto property owned by Katherine Aaslestad, Peter Aaslestad, Theda

Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez ("Landowner Plaintiffs"), as well as hundreds of others, and began illegally constructing its pipeline. ROA.1014 [¶¶56-59]. Plaintiffs White Hat and Mejía ("Arrestee Plaintiffs") joined with others at the site to protest the company's trespass and illegal construction, with the permission of Landowner Plaintiff Peter Aaslestad and Theda Larson Wright. ROA.1014 [¶¶57, 60]; 1017 [¶¶79-81]. Plaintiff Karen Savage, a journalist who was also arrested and charged with violating the newly amended Statute, went there to report on the protests. ROA.1017-1019 [¶¶81-88], 1461-1465. In June 2018, Aaslestad exercised his legal authority as a co-owner to preserve the property, which has been in his family for generations, by seeking an injunction to stop the company's activities and eject them from the property. ROA.1014 [¶61]. Subsequently, the company filed suit to expropriate a right-of-way on the property and Aaslestad and his sister Katherine, along with co-owner Theda Larson Wright, countersued for trespass. ROA.1016 [¶¶71-72]. In December 2018, the Landowners obtained a judgment confirming that the company had been trespassing at the time of Plaintiffs' arrests. ROA.1016 [¶¶73-75].

While these landowners were fighting the company's trespass in court, the amendments adding pipelines to the definition of critical infrastructure went into effect on August 1, 2018. ROA.1017 [¶79]. On August 18, 2018, Plaintiffs Savage and Mejía were arrested when they allegedly refused to move from the pipeline's

"right of way" on the property while standing under a tree in which a protester was sitting. ROA.1018-1019 [¶¶ 82-84]. Initially, the arresting officer charged them with violating the general trespass statute, La. R.S. 14:63.3, a misdemeanor, because a different co-owner of the property had given the pipeline company authority to forbid others. ROA.1018 [¶ 84]. While the officer was transporting Savage and Mejía to jail, another officer, who had not been present at the time of the arrests and had not seen where Mejía and Savage had been standing, arrived on the scene and later testified that there were no survey markers noting where the right of way was but that he "eye-balled" the tree from markers that were about 50 yards away and believed the area near the tree where they were arrested to be within the pipeline right of way. ROA.1018-1019 [¶¶ 85-88], 1349, 1351. He then instructed the arresting officer to charge them with committing a felony under La. R.S. 14:61. ROA.1018-1019 [¶¶85-88], 1349, 1351.Savage was arrested a second time, along with White Hat, on September 18, 2018, for allegedly violating the Statute two weeks earlier. ROA.1019-1021.

All of the officers involved in these arrests were employed by a private security firm providing security services for the pipeline company, which was itself trespassing on privately owned property at the time of the arrests, and the arrests were carried out even though there was no legally cognizable "right of way." ROA.1015-1017 [¶¶66-67; 76-78],1461-1465.

Plaintiffs 350 New Orleans, Louisiana Bucket Brigade, RISE St. James, Sharon Lavigne, and Harry Joseph had engaged in protests and other awareness-raising activities at or near sites where there were pipelines or pipeline projects, and have been chilled in the exercise of their First Amendment rights out of concern about how the amended law will be applied and the risk of felony arrest. ROA.39-43 [¶¶22, 26-29], 59-61 [¶¶97-108], (Complaint allegations), 1467-1468.

### C. Proceedings Below

Plaintiffs filed this case in the Middle District of Louisiana on May 22, 2019, against Defendants Jeff Landry, then-Louisiana Attorney General, Ronald J. Theriot, then-Sheriff of St. Martin Parish, and Bofill Duhé, as District Attorney of the 16th Judicial District, to challenge the 2018 amendments to La. R.S. 14:61. ROA.32.

Plaintiffs brought a facial challenge because the 2018 insertion of pipelines into the definition of critical infrastructure without limitation or guidance as to the area around pipelines to be protected under the Statute rendered La. R.S. 14:61(A)(3) void for vagueness in violation of Due Process (Claim I), ROA.61-62 [¶¶109-115], and as overbroad, viewpoint discriminatory, and violating their rights to expression and association under the First Amendment (Claims II-IV). ROA.62-65. Additionally, Plaintiffs who had been arrested and charged under the Statute also challenged the law as being unconstitutionally applied to them (Claim V). ROA.65 [¶¶ 136-137].

### 1. First Ruling on Motions to Dismiss

On September 16, 2019, all defendants moved to dismiss. The Attorney General argued that the claims against him were barred by sovereign immunity and that venue should be transferred to the Western District. ROA.151. All Defendants challenged standing and argued that the Complaint should be dismissed for failure to state claims. Defendants Theriot, ROA.258, and Duhé, ROA.270, also argued that the federal district court should abstain from adjudicating the claims of the arrested plaintiffs.

On July 30, 2020, the court granted the Attorney General's motion to be dismissed from the case, and to change venue to the Western District. ROA.551. The district court denied Defendants' motions in all other respects.

### 2. Second Ruling on Motions to Dismiss

On August 21 and 26, 2020, respectively, the Defendants Theriot and Duhé reurged their motions to dismiss on the grounds of standing, mootness, abstention, and failure to state a claim. ROA.704,718. On May 5, 2021, the district court granted in part and denied in part Defendants' motions to dismiss. ROA.861. The court held that the Plaintiffs who had been arrested and charged under the newly amended law had standing to challenge it, ROA.872, and that they sufficiently stated claims for violations of Due Process and the First Amendment.

The district court dismissed all other plaintiffs from the case. With regard to the Landowners, the court held that they had not shown injury. ROA.880-882. For the Organizational Plaintiffs, the court held that while two organizations – 350 New Orleans and the Louisiana Bucket Brigade — had satisfied the injury requirements for standing, they did not meet the causation and redressability requirements against the defendants remaining in the case, as the Attorney General had been dismissed. ROA.873-876. For RISE St. James, Lavigne, and Joseph, the court held that they had failed to sufficiently allege injury, in addition to causation and redressability against the defendants remaining in the case. ROA.876-880.

### 3. Summary Judgment

After a period of discovery, on April 18, 2022, Plaintiffs moved for summary judgment on all of their claims. ROA.968. Defendant Duhé filed a Motion for Judgment on the Pleadings and for summary judgment arguing that Plaintiffs lacked standing because he had rejected the charges against them and disavowed prosecution. ROA.1469.

Also, on May 23, 2022, the Attorney General moved to intervene back into the case and filed a proposed opposition to Plaintiffs' motion for summary judgment, ROA.1578, which Plaintiffs opposed. ROA.1711.

On June 5, 2023, the district court denied both Plaintiffs' and Defendant Duhé's motions for summary judgment, and indicated its intention to grant summary

judgment on Plaintiffs' claims in favor of Defendants pursuant to Fed. R. Civ. P. 56(f). ROA.1874, 1902. On June 26, 2023, Plaintiffs filed their response to the court's notice, which also served as a Motion to Reconsider. ROA.1904, 1906. On March 28, 2024, the district court denied Plaintiffs' motion to reconsider and issued summary judgment in favor of Defendants, dismissing Plaintiffs' claims with prejudice. ROA.2018 (Judgment), 2019 (Corrected Memorandum Ruling).

### D. The District Court's Decision

The district court made an overarching error which infected the remainder of its rulings and analyses: it concluded that the Statute only applied to private property and not public spaces or forums. From this premise, the court minimized the constitutional interest to be protected under the First Amendment, observing that while legal protections for First Amendment rights are at their "broadest" in traditional public forums, they are at their "nadir" in non-public forums, ROA.2034, and thus that Arrestee Plaintiffs "lack a constitutionally protected right to protest on private property." ROA.2047.

Even if viewed as a limiting construction to save the Statute, the finding would not resolve the vagueness and overbreadth problems resulting from the amendment for at least two reasons: 1) by focusing only on protesters on property owned by others, it disregarded the law's unconstitutional impact on the due process and First Amendment rights of *property owners* with pipelines running through their

land, such as the Landowner Plaintiffs here; and 2) the vagueness in the definition would still not give sufficient notice to protesters, or any average person, about where they can remain in the vicinity of a pipeline after having been forbidden, nor does it give adequate guidance to law enforcement about how to determine when and where the law has been violated, whether on private property or in a public forum.

### 1. Void for Vagueness

In holding that the Statute was not unconstitutionally vague, the court focused much of its analysis on provisions of the Statute that Plaintiffs do not challenge – subsections (A)(1) and (A)(4) of La. R.S. 14:61. ROA.2048. Those provisions restrict unauthorized entry onto premises "enclosed by any type of physical barrier" and/or "marked as a restricted or limited access area." The court held these provisions provide "clear notice to any ordinary person of the conduct that is prohibited." ROA.2048. Plaintiffs agree, but that only underscores the constitutional defects actually at issue in the case, which provide no comparable guidance. With regard to the provision Plaintiffs *do* challenge, subsection (A)(3), the court held that the Statute is not vague because it proscribes conduct "only after an authorized person instructs the trespasser to leave the premises," which it said constituted "sufficient notice." ROA.2048 (quotations and emphasis omitted). The court did not grapple with how a law enforcement officer is supposed to determine where a

pipeline premises begins and ends when charging an individual with a felony for remaining there after being forbidden – even if only on private property. Nor did it address the differing interpretations offered by the Attorney General, District Attorney, and actual law enforcement officers on this question.

### 2. First Amendment

The district court's ruling that the Statute only applied to private property also infected its First Amendment rulings that the Statute was not overbroad and not content-based, and thus not subject to strict scrutiny. Even if limited to private property, the Statute would still unconstitutionally encroach on the First Amendment rights of private property owners like the Landower Plaintiffs here, who own property with pipelines underground and cannot be sure where they or their guests can remain in the vicinity of pipelines after being forbidden, given the lack of definition in the Statute, and who have been chilled as a result of the law. The Statute violates their rights to association, assembly, and expression, in addition to their right to due process. The court also disregarded evidence of the discriminatory purpose for the introduction and passage of the amendments and clear language in the Statute vesting unbridled discretion in government actors to determine what constitutes "legitimate matters of public concern" in protests without any guidance as to where or how such protests may run afoul of the law.

Finally, in one sentence, and without analysis, the district court erroneously dismissed Arrestee Plaintiffs' as-applied challenge to the law, finding that the "lapse" of the limitations period for prosecution on the charges "moots any claims . . . based on their 2018 protest and arrest." ROA.2046-2047.

## SUMMARY OF THE ARGUMENT

The amendments challenged in this matter were drafted and enacted in 2018 in response to and at a time of growing protests against pipeline projects, including the Bayou Bridge Pipeline, which was under construction across south Louisiana at the time. Predictably, then, the first people arrested and charged under the law just weeks after it went into effect were people protesting the illegal construction of the Bayou Bridge Pipeline on sensitive land in the Atchafalaya Basin, and a journalist reporting on the events. During these arrests, the pipeline company was itself trespassing on the land where these protests and alleged violations of the Statute took place. The law enforcement officers making the arrests were in the employ of a private security firm providing services for the pipeline company.

The Legislature amended the Statute specifically to incorporate pipelines into the definition of critical infrastructure without clarification or guidance as to what would constitute a "premises" of any of these pipelines for the purpose of section (A)(3), which prohibits remaining on said premises after being forbidden. The legislature did so despite the fact that Louisiana's underground pipeline

infrastructure is vast – at least 125,000 miles of oil and gas pipelines alone – though the Statute also includes pipelines carrying water, many of which, if not most, are underground, invisible, and often unmarked.

In light of these undisputed facts, the Statute, as amended to include pipelines in such an open-ended way, is void for vagueness, in violation of due process, because it "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct," or it "(2) encourages arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999). While this is a disjunctive test, La. R.S. 14:(A)(3) as amended fails both parts.

The Statute's post-2018 vagueness also results in unconstitutional overbreadth in violation of the First Amendment, because it reaches a "substantial number" of unconstitutional applications, in the undefined, indefinite area around thousands miles of Louisiana territory, when judged in relation to the Statute's legitimate coverage – which the district court found to be "protecting critical infrastructure and the community." *See United States v. Stevens*, 559 U.S. 460, 473 (2010). The Statute also violates the First Amendment in light of evidence showing that it originated in response to growing protests against pipeline projects. The Statute's First Amendment infirmity is further reflected in the text of the statute, which permits expressive activity but only if it is deemed a "legitimate matter of public concern," conferring improper discretion to law enforcement to decide what

and where content is "legitimate." The "danger" of this kind of content and viewpoint discrimination "is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988).

The district court also erroneously dismissed the Landowner Plaintiffs and one of the Organizational Plaintiffs along with two Community Advocate Plaintiffs for lack of standing, applying a standard far stricter than that instructed by the Supreme Court and Fifth Circuit. The Landowner Plaintiffs have amply shown that they intend to associate with others to host political speech on their own property, which is arguably proscribed under the law, and this injury is traceable to the remaining Defendants. And the Organizational and Community Advocate Plaintiffs have amply shown that the expressive activity against pipelines in which they intend to engage is arguably proscribed by the law, and traceable to the Attorney General, who also should not have been dismissed from the case.

These errors of law mandate reversal and the grant of summary judgment in Plaintiffs' favor.

# ARGUMENT

## I. STANDARD OF REVIEW

Appellate courts review a grant of summary judgment *de novo,* applying the same standard as the district court. *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017). "In First Amendment cases in particular, an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Schalk v. Gallemore*, 906 F.2d 491, 494 (10th Cir. 1990) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)) (internal quotation marks omitted). All reasonable inferences from the record evidence must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in their favor. *In re Louisiana Crawfish Producers*, 852 F.3d at 462. This court "has the authority under 28 U.S.C. § 2106 to reverse summary judgment in favor of one party and to grant summary judgment in favor of another party if no relevant factual dispute exists." *Union Elec. Co. v. S.W. Bell Tel. L.P.*, 378 F.3d 781, 786 (8th Cir. 2004); *see also Black Warrior Elec. Membership Corp. v. Miss. Power Co.*, 413 F.2d 1221, 1226 (5th Cir.1969); *Fabric v. Provident Life & Accident Ins. Co.*, 115 F.3d 908, 914 (11th Cir. 1997) (collecting cases).

The court's rulings as to standing and sovereign immunity are reviewed *de novo*. *Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 555 (5th Cir. 1996) (standing); *Moore v. Louisiana Bd. of Elementary and Secondary Educ.*, 743 F.3d 959, 962 (5th Cir. 2014) (sovereign immunity). In ruling on a motion to dismiss, courts accept plaintiffs' "well-pleaded facts as true, viewing them in the light most favorable to the plaintiff . . . ." *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016).

## II. THE STATUTE APPLIES TO ALL FORUMS, AND ALSO VIOLATES THE DUE PROCESS AND FIRST AMENDMENT RIGHTS OF PRIVATE LANDOWNERS.

The Statute as amended in 2018 applies to all forums, whether private or public, given the proliferation of pipelines in the state, and the district court's forum analysis was in error. The district court undertook a lengthy analysis of the other forms of critical infrastructure which are not at issue here, and concluded that "premises" in La. R.S. 14:61(A)(3) only applied to private property and not traditional public forums, ROA.2034-2040, and therefore could not implicate the First Amendment limitations on speech restrictions in public forums because there is no "constitutionally protected right to protest on private property." ROA.2047. On this basis, the court dismissed the Arrestee Plaintiffs' First Amendment facial claims. This conclusion misses the mark for two reasons.

First, "premises" clearly does include public property – thereby permitting overbroad and vague speech restrictions on constitutionally protected public forums. The court's construction even conflicts with the position of the Attorney General, who, as the State's chief legal officer charged with defending the constitutionality of the law, presumed – until the court's ruling – that the Statute *would* apply to pipelines in public spaces and forums, though he argued the "carveouts" sufficiently protected First Amendment activity. ROA.1784.

Indeed, Plaintiffs have repeatedly shown that what is so significant about the 2018 amendments is that critical infrastructure is *no longer* limited to private property, enclosed facilities, and other non-public forums. The very existence of these other forms of critical infrastructure that are visible, above-ground, enclosed, and often posted with notices, helps illustrate how the vast array of different kinds of pipelines in the state and undefined areas around them rendered section (A)(3)'s regulation of underground pipelines vague and overbroad. Virtually every modern park, street, or public forum has a pipeline of some kind, including water, running in, under, near, or through it. That includes traditional public spaces like parks and streets, which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Imani v. City of Baton Rouge*,

614 F. Supp.3d 306, 341 (M.D. La. 2022) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

Second, even if "premises" of a pipeline only applied to private property, it would not save the Statute from Due Process and First Amendment claims brought by Landowner Plaintiffs. The district court only looked at the Statute from the perspective of protesters who do not own the property where the protests take place; but "First Amendment protections are at their apex" when a private entity "decides to host political speech." *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019). The Landowner Plaintiffs' claim, as discussed below (*infra* section V(A)), is that the Statute violates *their* First Amendment and Due Process rights precisely because it interferes with their rights over their own private property, which they have in the past used and intend to use to host political speech. Further, the Statute's vagueness and overbreadth would still combine to chill Landowner Plaintiffs' First Amendment rights as the area around a pipeline subject to the law would still be unclear, and even a landowner, and a law enforcement officer, would lack sufficient notice about where they or their guests, such as their fellow Arrestee Plaintiffs, could remain after being forbidden from the premises of a pipeline running through their property.

## III. DUE PROCESS: THE STATUTE IS VOID FOR VAGUENESS.

The Supreme Court has held that the "standards for permissible vagueness are strict" where, as here, First Amendment rights are involved. *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (where a statute's scope is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts"). A law is unconstitutionally vague when it "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct," or it "(2) encourages arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999). Moreover, the Supreme Court has emphasized that while "the doctrine is concerned with both notice and enforcement, . . . fear of arbitrary enforcement is the more important consideration." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (noting concern that identification requirement in law governing stops by police had "potential for arbitrarily suppressing First Amendment liberties").

While the two-part test in *Morales* is disjunctive, as amended, La. R.S. 14:61(A)(3) runs afoul of both parts.

### A. The District Court Applied the Wrong Standard to Assess Vagueness in Criminal Statutes.

As a threshold matter, the district court applied the wrong standard for vagueness challenges to criminal statutes in holding that "mere imprecision does not

render a statute vague." ROA.2047 (citing *Ferguson v. Estelle*, 718 F.2d 730 (5th Cir. 1983)). The court relied on *Ferguson*'s statement that "[a] facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." ROA.2047.

However, this looser test for vagueness only applies to civil statutes regulating economic activity. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001). For criminal statutes at issue here, the stricter, two-part, disjunctive vagueness test is applied to determine whether the statute: (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits;" or (2) "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Id*. at 507 (citing *City of Chicago v. Morales*, 571 U.S. 41 (1999)). Indeed, in *Kolender v. Lawson,* the Court specifically rejected the argument that a criminal statute must be "vague in all of its possible applications," which the Court noted is a standard applicable to "economic regulation." 461 U.S. 352, 359 n.8 (1983). The Court even acknowledged that the weighty "concern" about criminal penalties has "at times, led us to invalidate a criminal statute on its face *even when it could conceivably have had some valid application*." *Id.* (emphasis added).

The Statute fails the stricter vagueness test applicable to criminal statutes. Yet, as set forth below, the defects in La. 14:61(A)(3) are so severe that even if the looser standard applied, the 2018 amendment should still fail because the addition of Louisiana's vast networks of pipelines to the definition of critical infrastructure without limitation or qualification provided no guidance or standards *at all* for determining what constitutes the premises of a pipeline.

**B. The Law Does Not Provide Adequate Notice of Prohibited Conduct and an Instruction to Leave Cannot Cure It.**

The 2018 addition of pipelines to La. R.S. 14:61 turned vast, unmarked stretches of land into critical infrastructure and exposed individuals to up to five years' imprisonment for remaining on such infrastructure after being forbidden. In particular, La. R.S. 14:61(A)(3) punishes "[r]emaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person" but does not define what "premises" means when it comes to pipelines nor identify who constitutes a "custodian" or "authorized person."

The prior version of the Statute applied to critical infrastructure that was obviously visible or clearly demarcated, which would make plain to any citizen – and law enforcement officer – where a person's unlawful presence begins and ends. Once pipelines were inserted into an otherwise clear statute, the phrase "upon or in the premises of" became vague and incomprehensible when applied to pipelines and

therefore does not – cannot – provide adequate notice to those who could be subject to the law and exposed to up to five years' imprisonment. *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). Every other type of critical infrastructure encompassed by the Statute consists of an identifiable, above-ground facility that is often enclosed by a "physical barrier" and posted with notices to the public. La. R.S. 14:61(A)(1), (A)(4) and (B)(1). The district court pointed to these provisions to support its ruling that the law was not vague, even though Plaintiffs agree these provisions are not vague and thus do not challenge these aspects of the Statute. ROA.2048. Rather, these provisions prove Plaintiffs' central point – that La. R.S. 14:61(A)(3) became impermissibly vague when pipelines were added – precisely because in most cases they are not enclosed by a physical barrier and are often underground, unmarked, or inaccurately marked, as noted above.

The district court glossed over all of these concerns and rested its ruling as to vagueness on the notion that a violation of the Statute requires an instruction to leave, which it concluded would provide "sufficient notice" of proscribed conduct. ROA.2048. In doing so, the Court failed to consider Supreme Court precedent instructing that such commands cannot save vague statutes, particularly when they lack minimal guidelines to govern law enforcement and prevent arbitrary or discriminatory enforcement in issuing such orders, as this one clearly does. *See*

*Wright v. Georgia*, 373 U.S. 284, 291-92 (1963) ("Obviously . . . one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."); *see also Morales*, 527 U.S. at 58-59 (the fact that "loiterers" were not subject to criminal sanction until after disobeying a dispersal order did not save the statute from being unconstitutionally vague, and the order itself did not provide adequate notice to an average person as to how to conform their conduct to the law).

An instruction to leave cannot save a statute, like this one, that "fails to give adequate warning of the boundary between the constitutionally permissible and constitutionally impermissible applications of the statute." *Wright*, 373 U.S.at 292. The 2018 addition of pipelines to the definition fails to give adequate warning of the literal boundary between permissible and constitutionally impermissible applications of the Statute because there is virtually no way for anyone – including a person instructing a purported trespasser to leave – to readily determine in many cases what constitutes the "boundary" of the "premises" of a pipeline. Even if an individual were to avoid criminal prosecution by obeying an instruction to leave the premises, an incorrect instruction by law enforcement – owing to the standardless determination of what constitutes a pipeline premises – would impermissibly suppress protected First Amendment speech, assembly, association, and/or petitioning activity.

Regulations found by this Court and the Supreme Court to survive vagueness challenges help illustrate the unconstitutionality of section (A)(3) after 2018. In *Hill v. Colorado*, the Supreme Court found that "one of the [law]'s virtues is the specificity of the definitions of the zones described in the statute" and that a *scienter* requirement also helped save the law that prohibited "knowingly approach[ing]" within *eight feet* of another person, without their consent, for the purpose of engaging in protest, education, or counseling, within a *100-foot* zone of a healthcare facility. 530 U.S. 703, 733 (2000). Likewise, in *CISPES (Committee in Solidarity with People of El Salvador) v. F.B.I.,* this Court held that with regard to a law that restricted expressive activity within *100 feet* of a foreign embassy, the *scienter* requirement that a person "willfully" commit the violations "serve[d] both to further restrict any arbitrary enforcement of the statute, and to reduce the likelihood of conviction for a good faith exercise of expressive rights." 770 F.2d 468, 476 (5th Cir. 1985). In contrast, the law challenged here does not specify the definition of zones prohibited with regard to premises of pipelines, nor does it require any showing of intent or *scienter*. The danger here, as discussed throughout, is that the vagueness in the Statute could lead the average person or protester to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked" – whether on private or public land. *Grayned v. City of Rockford,* 408 U.S. 104, 109 (1972) (internal citations and quotations omitted).

## C. The Law Does Not Establish Minimal Guidelines for Law Enforcement and Encourages Arbitrary and Discriminatory Enforcement.

The Supreme Court has stressed that the "requirement that a legislature establish minimal guidelines to govern law enforcement" is even more important than actual notice of prohibited conduct. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Where the legislature "fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id. See also Morales*, 527 U.S. at 60 (striking down as facially invalid a loitering statute in part because it lacked minimal guidelines to govern law enforcement).

Plain evidence of the lack of law enforcement guidance is on display in the briefing below, where state officials offered conflicting interpretations of the Statute's scope. The Attorney General understood "premises" to be a "tract of land" where a pipeline either "exists, or does not" and he suggested that this fact is ascertainable (though he does not say how, nor point to any provision in the Statute that offers guidance to a citizen or officer to ascertain where, underground, such a pipeline might exist). ROA.164. If his assessment is given credence, then "premises" would include the *entirety* of each tract of land a pipeline runs through. Defendant District Attorney Duhé argued in previous briefing that the Statute was not vague because it applied to critical infrastructure "completely enclosed by any type of

physical barrier" – a provision of the Statute not applicable in this case – and that the "premises" can be determined for the parcel of land where plaintiffs were arrested by referring to an expropriation judgment containing the pipeline right-of-way. ROA.284, 739-740. Needless to say, these conflicting and technical interpretations would not guide the average citizen or law enforcement officer.

The deputies involved in the arrests of plaintiffs also had differing views as to what area is covered by the law. Deputy Martin, who was involved in the arrests of Savage and Mejía on August 18, 2018, testified that he would not enforce the statute on a pipeline that was underground and not clearly marked because he believed the statute required that critical infrastructure be clearly marked. ROA.1024 [¶120], 1352-1353 (" . . . from what I could remember there were several subsections that said it had to be clearly marked, designated, fenced off, where somebody would know it was a restricted area and not just a pipeline or under construction. And if none of those applied you wouldn't be able to apply that statute to that crime."). As noted above, however, the Statute itself does not require that premises of a pipeline be clearly marked, designated, or fenced off – meaning any other law enforcement officer could choose to take a contrary view, not inconsistent with the vague terms of the Statute. Deputy Gauthier, also involved in the arrests of Savage and Mejía, testified as to his uncertainty about how to enforce the law with regard to an underground pipeline. ROA.1024-1025 [¶ 121-122], 1360-1361,1363.

One example of the officers' testimony is particularly instructive: Lt. Martin testified in a deposition that there were no survey markers in the area where Plaintiffs Savage and Mejía had been standing near a tree where they were arrested by a different officer and initially charged with misdemeanor trespass. ROA.1018-1019 [¶¶ 82-88]. Martin, who was not even present when Savage and Mejía were taken into custody by his fellow deputy and did not personally witness where they were standing, testified that in order to determine that the Plaintiffs had been standing in the pipeline "right of way," he "eyeball[ed]" it – after the Plaintiffs had been arrested and taken to the jail – from two survey markers about 50 yards away. ROA.1018 [¶ 87], 1349, 1351. Martin's after-the-fact "eyeballing" resulted in the charge escalating from a misdemeanor to a felony carrying up to five years' imprisonment. Suppression of protected expressive activity, and of the press, through the criminal law cannot depend on an officer's *ad hoc* guess work, or rough estimation, about a Statute's applicability.

## IV.  FIRST AMENDMENT: THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' FIRST AMENDMENT CLAIMS BECAUSE THE STATUTE IS SUBSTANTIALLY OVERBROAD AND IS IMPERMISSIBLY CONTENT-BASED.

### A. The Statute Is Substantially Overbroad.

As this Court has observed, vagueness and overbreadth are "logically related and similar," and some commentators consider them "indistinguishable." *CISPES v.*

*F.B.I.*, 770 F.2d at 472. The "vice of an overbroad statute in the First Amendment context is that 'persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected expression.'" *Id*. (citing *Gooding v. Wilson*, 405 U.S. 518, 521 (1972)). A statute is overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The court erred when it found that the Statute was not overbroad in violation of the First Amendment. ROA.2027, 2049. In *McCullen v. Coakley*, the Supreme Court found that a regulation prohibiting knowingly standing within fixed and identifiable buffer zones around clinics "burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests," and thus failed intermediate scrutiny. 573 U.S. 464, 490 (2014). Here, the premises of pipelines are not fixed and defined; they are vague and amorphous, and as Plaintiffs have shown, burden far more speech than necessary to meet the State's purported purpose. The 2018 amendments "unnecessarily circumscribe protected expression" – by penalizing protected expression in an undefined area around pipelines and not speech-neutral interests like preventing damage – and are therefore overinclusive and overbroad. *See Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (invalidating ordinance that applied to "all County roads, regardless of location or

traffic volume, and . . . thus prohibit[ing] *all* [expressive conduct], even where those activities would not be dangerous"). As in *Reynolds*, the vagueness and overbreadth of the 2018 Statute felonize mere presence in the undefined vicinity of pipelines even when that presence would not be dangerous or cause damage.

The district court accepted the Attorney General's *post-hoc* justification for the Statute when it found it furthered the government's interest "protecting critical infrastructure and the community by prohibiting and penalizing unauthorized entry onto critical infrastructure before those structures can be damaged or otherwise compromised." ROA.2042. That is, the statute does not target actual damage, as promised by the legislative sponsor of the amendment, ROA.1005 [¶¶ 34-35], but seeks to restrict entry – including for purposes of speech – onto property in anticipation of the possibility of damage. Again, the court focused here on forms of critical infrastructure and provisions in the Statute that are not at issue – *i.e.*, unauthorized entry onto clearly visible and demarcated facilities – and not remaining after being forbidden from the undefined and invisible premises of a pipeline under section (A)(3). Even so, this is exactly the kind of prophylactic measure that is not permitted under First Amendment doctrine, because it restricts more speech than necessary to achieve what might otherwise be a permissible regulation. *NAACP v. Button*, 371 U.S. at 438 ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area touching our most

precious freedoms.") (internal quotations and citations omitted). *See also Hill v. Colorado*, 530 U.S. at 762 (Scalia, J., dissenting) ("Prophylaxis is the antithesis of narrow tailoring" in First Amendment contexts). Because the Statute as amended in 2018 reaches a "substantial number" of unconstitutional applications, across thousands of miles of Louisiana territory, when judged in relation to the Statute's legitimate coverage – i.e., interests asserted by the legislation's sponsor and the Attorney General – it is unconstitutionally overbroad. *See United States v. Stevens*, 559 U.S. 460, 473 (2010); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 614 (1973).

The district court's interpretation that the Statute is confined to private property and non-public forums, does not solve the overbreadth problem. The Statute's vagueness as to premises applies to pipelines on private property as well, impacting landowners with pipelines on their land and protesters who may be legally present and who would run the risk of being charged with remaining on a pipeline premises after being forbidden without clear notice as to the legal boundaries.

**B. The Statute Is Impermissibly Content-Based.**

A statute is content-based, and therefore subject to strict scrutiny, if it "discriminate[s] based on 'the topic discussed or the idea or message expressed,'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022), or when it is "adopted by the government 'because of disagreement with the message

[the speech] conveys.'" *Reed v. Town of Gilbert, Arizona,* 576 U.S. 155, 164 (2015). The "danger" of this kind of content and viewpoint discrimination "is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988). *See also Forsyth Cnty., Georgia v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Cox v. Louisiana*, 379 U.S. 536, 557-58 (1965); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) (vesting someone with "unbridled discretion" is a means "to hide unconstitutional viewpoint discrimination") (collecting cases).

The 2018 amendments appear to condone "lawful" petitioning activity on "legitimate matters of public interest," including "any labor dispute between any employer and its employee," and "a position protected by the United States Constitution or Constitution of Louisiana" and "commercial or recreational activities." La. R.S. 14:61(D)(1). But in handing such broad discretion to a government official to ascertain what is "legitimate" speech and what is not and without clear guidance as to where it is lawful and where it is not under La. R.S. 14:61(A)(3) strikes at the heart of the Due Process Clause's prohibition of vague and arbitrary legislation, as discussed above. The statute commits a First Amendment offense as well by authorizing delineations on the content of speech; that is, even if we do not know from the face of the Statute what speech is legitimate and what is

not, we do know the Statute will authorize some speech content while prohibiting other speech content at the discretion of some future government decisionmaker. The Supreme Court has recognized that a statute "that allows arbitrary application . . . has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cnty., Georgia v. Nationalist Movement,* 505 U.S. at 130 (internal quotation marks omitted).

The district court ruled that the Statute was not content-based for two faulty reasons. First, the court held that this "carveout" for speech "exempt[ed] all protected speech regardless of content," ROA.2032, glossing over Plaintiffs' concern that the "carveout" in the very text of the Statute leaves it to the unbridled discretion of government officials to determine what constitutes "legitimate" speech. Even if it were an unqualified carveout, such a provision "cannot substantively operate to save an otherwise invalid statute," *CISPES v. F.B.I.,* 770 F.2d 468, 474 (5th Cir. 1985), because it "merely restates already-existing constitutional limits on any government activity." *United Food & Com. Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1207 (D. Ariz. 2013). And, unlike the carveout in the challenged Statute, the provisions in *CISPES* and *United Food & Commercial Workers* did not include language requiring a determination that the expression concerned "legitimate matters of public interest."

Second, the court disregarded evidence that the amendments were motivated by viewpoint discrimination. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC,* 596 U.S. at 76 ("If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction . . . that restriction may be content based."). Evidence the district court disregarded shows that the amendments were authored and adopted to further industry and legislators' opposition to growing protests against high-profile pipeline projects – including the Bayou Bridge Pipeline that was under construction at the time of the bill's introduction. ROA.1001-1005 [¶¶10-35]. The bill's author and legislative sponsor attempted to skirt the concerns by other legislators and public commenters about the bill's impact on First Amendment activity, explaining during a legislative hearing that the bill "does nothing to impact the ability to peacefully protest. It only comes into play when there is damage to that critical infrastructure, so if you don't damage anything, this law does not apply." ROA.1005 [¶¶ 34-35]. But the law that emerged does not require damage, or even an intent to commit damage. A separate provision was split off from the original legislation and enacted into a different Statute. The result is that La. R.S. 14:61(A)(3) was enacted with an impermissibly vague definition of critical infrastructure as it relates to pipelines, and as such is subject to arbitrary and discriminatory enforcement, with a purported "carveout" for expressive conduct that vests government officials with unbridled discretion to

determine whether that expression relates to "legitimate matters of public interest." The Statute was then immediately used by the Bayou Bridge Pipeline company to target protesters who were trying to call attention to the company's illegal trespass and construction on land co-owned by Landowner Plaintiffs, and who were arrested and charged by law enforcement officers in the employ of the company's security firm. ROA.1014 [¶¶56-60], 1015[¶¶66-67], 1016-1021.

The Statute should have been subjected to strict scrutiny in light of the evidence that the amendments were drafted and enacted in response to increasing protest activity against pipelines. *See Reed*, 576 U.S. at 166 (reiterating that content-based laws are subject to the strictest scrutiny). This is a demanding standard and "'it is the rare case' in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). As Plaintiffs demonstrated in briefing below, the Statute is not narrowly tailored to further a compelling state interest. ROA.984-988.

Yet, even accepting the court's finding that the Statute is content neutral, the amendment still restricts speech activity, thereby triggering – and failing – intermediate scrutiny, which requires that such a law be "narrowly tailored to serve a significant governmental interest." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin,* LLC, 596 U.S. at 76. Narrow tailoring requires that "the government must demonstrate that alternative measures that burden substantially less speech would

fail to achieve the government's interests, not simply that the chosen route is easier."
*Id*. at 495. The Supreme Court has recognized that the "existence of adequate
content-neutral alternatives . . . 'undercut[s] significantly' any defense of such a
statute" and "cast[s] considerable doubt on the government's protestations that 'the
asserted justification is in fact an accurate description of the purpose and effect of
the law.'" *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 396 (1992) (citations omitted).

The district court incorrectly applied basic principles of intermediate scrutiny
to the provision at issue in this case. Again, focusing on the provisions of the Statute
that are not at issue here – those relating to unauthorized entry into clearly
demarcated and enclosed facilities – the district court found that the Statute furthered
the government's interest in "protecting critical infrastructure and the community by
prohibiting and penalizing unauthorized entry onto critical infrastructure before
those structures can be damaged or otherwise compromised." ROA.2042. But such
"[b]road prophylactic" measures – which burden expressive activity in order to
prevent the *prospect* of damage (rather than directly punishing damage itself) – are
suspect in the area of First Amendment freedoms, *see NAACP v. Button*, 371 U.S. at
438, which require "[p]recision of regulation." This legislative overreach cannot
stand particularly when applied to section (A)(3) – the statutory provision actually
at issue here which encompasses undefined areas around well over a hundred
thousand miles of pipelines in the State. Plaintiffs pointed to a number of expressly

content-neutral alternative laws that prohibit and punish damage, including to critical infrastructure, which the court discounted. ROA.2041-2042. When viewed alongside the Statute's extreme vagueness with regard to pipelines, the availability of these content neutral alternatives renders the Statute not narrowly tailored to achieve the purported purpose. The Statute cannot survive intermediate scrutiny, much less the more exacting strict scrutiny to which it should have been subjected.

## V. ARRESTEE PLAINTIFFS' AS-APPLIED CHALLENGE IS NOT MOOT.

In one sentence, and without any analysis, the court ruled that Arrestee Plaintiffs' as-applied challenge to the Statute was moot because the limitations period for their prosecution had lapsed. ROA.2046-2047. This was error, as this matter "fit[s] comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *Fed. Election Comm'n. v. Wis. Right To Life, Inc.*, 551 U.S. 449, 462 (2007). This exception applies here because, "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id*.

Earlier, in its ruling that these Plaintiffs – White Hat, Savage, and Mejía – had standing to maintain a facial challenge to the Statute, the court found that they faced a "threat of future enforcement" that was substantial given the "history of past enforcement." ROA.872. That same reasoning applies to the assessment that the

43

exception applies to their as-applied challenge as well, *i.e.*, that there is a reasonable expectation that they will be subject to the same action again.

## VI.   THE DISTRICT COURT ERRED IN DISMISSING THE ATTORNEY GENERAL AS A DEFENDANT BECAUSE THE OFFICE RETAINS SUFFICIENT CONNECTIONS TO, AND ENFORCEMENT AUTHORITY OVER, THE STATUTE.

In its July 30, 2020 ruling granting in part and denying in part Defendants' motion to dismiss, the district court dismissed the Attorney General as an official-capacity defendant based on its finding that Plaintiffs had not sufficiently alleged that the Attorney General has sufficient connection with the enforcement of or prosecution under La. R.S. 14:61. ROA.606-607. This was an error as Plaintiffs showed multiple connections on the part of the Attorney General to the enforcement of or prosecution under La. R.S. 14:61 – a showing that far exceeds the mere requirement of showing "some scintilla" of enforcement authority. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).

"[O]fficial-capacity actions for prospective relief are not treated as actions against the State." *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 n.10 (1989) (citing *inter alia Ex Parte Young*, 209 U.S. 123 (1908)). In determining whether the *Ex Parte Young* exception applies in a federal suit against a state official, "[t]he fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as

it exists." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (citing *Ex Parte Young*, 209 U.S. at 157).

Here, Plaintiffs showed that the Attorney General bears a clear and sufficient legal connection to the enforcement of the Statute being challenged in this case – far more than a "scintilla." The Louisiana Constitution mandates that the Attorney General is the "chief legal officer of the state," with authority to advise and assist in the prosecution of any criminal case at the request of district attorneys in the state, and to institute, prosecute, or intervene in any criminal action or proceeding, or supersede any attorney representing the state in any civil or criminal action, for cause and with judicial authorization. La. Const. Art. IV, Sec. 8. The Louisiana Code of Criminal Procedure provides that the "attorney general *shall exercise supervision over all district attorneys in the state.*" La.C.Cr.P. Art. 62(A) (emphasis added). In turn, and "[s]ubject to the supervision of the attorney general," district attorneys have "entire charge and control of every criminal prosecution instituted or pending in [their] district, and determine[] whom, when, and how they shall prosecute." La.C.Cr. P. Art. 61 (emphasis added). Beyond his prosecutorial and supervisory authority in criminal cases, the Attorney General also has a special connection to the subject-matter of the law challenged here. Pursuant to La. R.S. 29:725.1, the Attorney General is designated to be legal advisor to the Governor's Office of

Homeland Security and Emergency Preparedness (GOHSEP), which has the authority and mandate to protect critical infrastructure against threats.[6]

The court ignored the Attorney General's supervisory authority over district attorneys when it dismissed the Attorney General from the case. The district court relied heavily, and erroneously, on a ruling in another district court case. ROA.606 (citing *Doe v. Jindal*, No. CIV.A. 11-554-BAJ, 2011 WL 3664496, at *3 (M.D. La. Aug. 19, 2011)). But in that case, the court ignored the Attorney General's mandated supervisory authority over district attorneys when it found that the Attorney General "lack[ed] the authority to order those with original jurisdiction to exercise it. *Doe*, at *3.

But Plaintiffs have alleged here, and the law is clear, that the Attorney General has supervisory authority over district attorneys and therefore has the authority to *supervise* them about whether and how to enforce and prosecute state criminal statutes. The Attorney General's website publicizes just some of the ways in which it exercises this authority, noting that its "Criminal Program conducts or assists in criminal prosecutions; acts as advisor for District Attorneys, the Legislature and law enforcement entities."[7] It further notes that its General

---

[6]     *Critical Infrastructure*, Governor's Office of Homeland Security & Emergency Preparedness, https://gohsep.la.gov/divisions/emergency-management/critical-infrastructure/ (last accessed July 23, 2024) (discussing GOHSEP's responsibility for securing critical infrastructure).

[7]     *Criminal Division*, Louisiana Department of Justice, https://www.ag.state.la.us/Division/Criminal (last accessed July 23, 2024).

Prosecutions Section "serves as (1) advisor to the district attorneys, law enforcement and the Legislature, (2) a training agency for law enforcement, and (3) as liaison between various levels of law enforcement within the state."[8]

Thus, were this Court to rule the Statute as amended in 2018 unconstitutional, the Attorney General *would* be in a position to provide the relief Plaintiffs seek by exercising its supervisory authority over district attorneys and instructing and advising them as to the unconstitutionality of the amendment. In light of the district court's error, the Attorney General should be reinstated.

## VII.  ALL PLAINTIFFS HAVE STANDING TO CHALLENGE THE STATUTE.

In 2021, the court incorrectly dismissed the Landowner Plaintiffs, an Organizational Plaintiff, and two Community Advocate Plaintiffs, ROA.906-908, by applying an Article III standing standard that is far more rigorous than that instructed by the Supreme Court and Fifth Circuit.

To satisfy the requirement of standing, a plaintiff must show that they have (1) suffered an injury-in-fact that is (2) fairly traceable to the action of the defendant and (3) redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). In a pre-enforcement challenge to a statute, a plaintiff satisfies the injury-in-fact requirement if they can show that (1) they have an "intention to engage in a

---

[8]    *Id.*

course of conduct arguably affected with a constitutional interest," (2) that the "intended future conduct is 'arguably ... proscribed by [the statute],'" and (3) "the threat of future enforcement of the [statute] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020, revised Oct. 30, 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

**A. The Landowner Plaintiffs Have Suffered Injuries-in-Fact.**

The district court correctly ruled that the Landowner Plaintiffs have satisfied redressability and traceability, ROA.906, but erroneously ruled that they have not satisfied the injury-in-fact requirement. ROA.908.

The Landowner Plaintiffs satisfy the first element of injury-in-fact under *Susan B. Anthony List*, because they have sufficiently alleged an intention to engage in a course of conduct "affected with a constitutional interest," 573 U.S. at 159: they intend to associate with others to host political speech on their property, which has been designated a critical infrastructure under the new law. This implicates their freedom to host speech. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2400-401 (2024) ("ordering a party to provide a forum for someone else's views implicates the First Amendment" and "expressive activity includes presenting a curated compilation of speech originally created by others"); *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) ("[w]hen a private entity . . . decides to host political speech, its First Amendment protections are at their apex"). It also

implicates their freedom of association. *See McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021) ("[a]n individual's freedom to speak . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed" (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984))). And finally, it implicates their use and enjoyment of their own property. *See Simi Inv. Co. v. Harris Cnty., Texas*, 236 F.3d 240, 249 (5th Cir. 2000) (government violates due process when it deprives someone of property, which is "a constitutionally protected interest").

The Landowner Plaintiffs allege that they have in the past used their property to host speakers protesting pipelines, and they "intend to continue to" do so. ROA.40-41,58 [¶¶23-25, 95]. The pipeline that is running through their property, as well as other pipelines, are political issues that are a matter of concern to Landowner Plaintiffs. ROA.40 [¶23] (Landowner Plaintiffs "were opposed to the Bayou Bridge project out of concern about the environment and health of communities that would be affected by the pipeline, damage to the Basin, effects on flood control, and coastal land loss in Louisiana, and the increasing threats posed by climate change."). That the Landowner Plaintiffs intend to use their property to host political speakers on this matter is enough to satisfy the first element of injury-in-fact. *See Book People, Inc. v. Wong*, 91 F.4th 318, 329 (5th Cir. 2024) (that plaintiffs engaged in protected expression and "intend to continue doing so" was sufficient to satisfy first element

of injury-in-fact); *Fenves*, 979 F.3d at 331 (where students alleged that they "want[] to engage" in political speech, first element of injury-in-fact was satisfied); *Barilla v. City of Houston*, 13 F.4th 427, 432 (5th Cir. 2021) (where plaintiffs' complaint asserts that he "wants" to engage in protected expression, and that he had previously engaged in that expression, first element of injury-in-fact was satisfied).

The Landowner Plaintiffs also satisfy the second and third elements of injury-in-fact because the statute "arguably proscribe[s]" their intended conduct, and the threat of enforcement is credible, concrete, and substantial. *Fenves*, 979 F.3d at 330-31. The Landowner Plaintiffs' property now has a pipeline running through it, rendering it a critical infrastructure under the 2018 law, including under the Attorney General's interpretation. The law arguably proscribes them and their guests from being "on or upon" the premises of that pipeline as long as some "owner, lessee, custodian" or some other unknown "authorized person" tells them to leave. La. R.S. 14:61(A)(3), (B)(1). Their concern about enforcement is "substantial" because it is informed by how the law has already been enforced: a previous time when the Landowner Plaintiffs engaged in precisely the course of conduct they intend to engage in in the future, the law was applied to proscribe it. "Past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Driehaus*, 573 U.S. at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (plaintiff showed a credible threat of prosecution based on companion's

arrest under the challenged statute for conduct he desired to continue and believed was constitutionally protected)).

The district court incorrectly reasoned that the Landowner Plaintiffs did not satisfy injury-in-fact because they "do not allege that they participated in the protests that led to the arrest of" the Arrestee Plaintiffs, or that "but for the Amended Statute, they would participate in protests at the pipeline in the future." ROA.881. This was error because Landowner Plaintiffs' injuries stem not from their own participation in protests, which is not a part of their claims, but from how they would like to use and enjoy their property: to host political speakers, which is a cognizable injury. And they have sufficiently alleged that they are objectively chilled: that this intended course of conduct is arguably proscribed by the statute. *See Driehaus*, 573 U.S. at 158.

Also contrary to the district court's reasoning, ROA.881-882, this injury is not to a third party; it is to the Landowner Plaintiffs as individuals who want to use their own property to host political speakers and thus exercise their *own* constitutional rights. The Supreme Court has held that decisions by private entities in making "choices about what third-party speech to display and how to display it," *Moody*, 144 S. Ct. at 2393, implicate the rights of the host even though they are hosting third-party speech. *See also Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (First Amendment protection does not "require a

speaker to generate, as an original matter, each item featured in the communication"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974) (compelled publishing of third-party speech implicates First Amendment rights of publisher). So too in this case Landowner Plaintiffs are themselves injured by the proscription on associating with and hosting third-party political speakers on their property because their property has been designated a critical infrastructure.

### B. All Organizational and Community Advocate Plaintiffs Have Standing.

#### 1. Plaintiffs Sharon Lavigne, RISE St. James, and Pastor Joseph Have Satisfied the Injury-In-Fact Requirement.

The district court correctly found that Organizational Plaintiffs Louisiana Bucket Brigade and 350 New Orleans had suffered injuries-in-fact because "both organizations allege that they have organized protests at pipelines in the past and that the chilling effect caused by the criminal penalties of La. R.S. 14:61 will curtail their protest activities in the future." ROA.874-876. But despite the fact that Plaintiffs Lavigne, Joseph, and RISE St. James have all suffered injuries-in-fact for the same reason as Louisiana Bucket Brigade and 350 New Orleans, (ROA.39, 41-42, 59 [¶¶22, 26-27, 97-100]), the court ruled that they had not sufficiently alleged injury-in-fact. ROA.876-877.

Plaintiffs Lavigne, Joseph, and RISE St. James satisfy the first element of injury-in-fact because they intend to engage in constitutionally protected conduct.

Plaintiff Lavigne alleges she "intends to continue to" organize marches, press conferences, and demonstrations, in the area known as "Cancer Alley," the "85-mile stretch between Baton Rouge and New Orleans heavily burdened by petrochemical facilities." ROA.39 [¶22]. RISE St. James alleges that it "intends to continue to" organize "press conferences, revivals, and marches to protest the permitting of new petrochemical facilities in the surrounding area." ROA.42 [¶27]. Similarly, Pastor Joseph alleges that he has "helped organize public events on these issues and has organized and participated in marches and press conferences about the Bayou Bridge Pipeline and other petrochemical projects, and at times attempted to monitor, observe and report on the construction of the Bayou Bridge pipeline. He is concerned that the new law will make it more difficult to organize and participate in marches and events expressing opposition to such projects, given the proliferation of pipelines in the community." ROA.41 [¶26]. These allegations are sufficient to establish the first element of injury-in-fact for all three Plaintiffs. *See Wong*, 91 F.4th at 329 (that plaintiffs engaged in protected expression and "intend to continue doing so" was sufficient to satisfy first element of injury-in-fact); *Fenves*, 979 F.3d at 331 (where students alleged that they "want[] to engage" in political speech, first element of injury-in-fact was satisfied); *Barilla*, 13 F.4th at 432 (where plaintiffs' complaint asserts that he "wants" to engage in protected expression, and that he had previously engaged in that expression, first element of injury-in-fact was satisfied).

Plaintiffs Lavigne, RISE St. James, and Joseph also satisfy the second and third elements of injury-in-fact because the statute "arguably proscribes" their intended conduct, and the threat of enforcement is credible, concrete, and substantial. *Fenves*, 979 F.3d at 330-31. These Plaintiffs intend to engage in speech against pipelines in their communities in an area of the State dubbed Cancer Alley – because of the proliferation of oil, gas, and petrochemical facilities, and which has a vast network of pipelines running through it. ROA.40 [¶22], 59 [¶98-99]. Virtually anywhere they organize a protest could include a pipeline. Additionally, their concern about enforcement is "substantial" because it is informed by how the law has already been enforced: against the Arrestee Plaintiffs.

Nevertheless, the district court reasoned that "[u]nlike the other organizational Plaintiffs, they do not allege specific examples of protests where their members were arrested or threatened with arrest; nor do they allege any facts regarding specific protest activities likely to result in prosecution." ROA.876-877. However, these Plaintiffs do not need to show that they themselves were arrested or threatened with arrest. *Barilla*, 13 F.4th at 431 ("A plaintiff bringing such a [pre-enforcement] challenge need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing"); *Steffel*, 415 U.S. at 459 (plaintiff showed a credible threat of prosecution based on companion's arrest under the challenged

statute for conduct he desired to continue and believed was constitutionally protected).

Nor do they need to name "specific protest activities." For example, in *Fenves*, the Fifth Circuit found that it was sufficient that a plaintiff alleged that she "wants to engage in open and robust intellectual debate with her fellow students" about controversial topics, and that other plaintiffs "wish to engage in debates and discussions covering 'a wide array of different views on'" other controversial matters, but these topics were arguably covered by the prohibition on "verbal harassment." 979 F.3d at 331. The plaintiffs were not required to name specific events where they had been disciplined or intended to speak. This is especially true in a vagueness challenge, where "[i]f the provision were truly vague, appellees should not be expected to pursue their collective activities at their peril." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 303 (1979).

### 2. All Organizational Plaintiffs Have Satisfied Redressability and Traceability.

The district court ruled that the injury to Organizational Plaintiffs was not traceable to the remaining defendants, as the Attorney General had been dismissed from the case, and not redressable. ROA.877-879. As argued above, the Attorney General should not have been dismissed from the case, and Organizational Plaintiffs' injuries are traceable to, and redressable by a court order against, him.

## **CONCLUSION**

Plaintiffs respectfully request that this Court reverse the district court's grant of summary judgment to Defendants and grant summary judgment to Plaintiffs. In the alternative, Plaintiffs respectfully request that this Court reverse the judgment of the district court and remand the matter for further proceedings.

Respectfully submitted,

/s/Pamela C. Spees
Pamela C. Spees
La. Bar Roll No. 29679
Baher Azmy*
Astha Sharma Pokharel
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel. & Fax (212) 614-6431
pspees@ccrjustice.org
bazmy@ccrjustice.org
asharmapokharel@ccrjustice.org

William P. Quigley (cooperating counsel)
La. Bar Roll No. 7769
Professor Emeritus
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel. (504) 710-3074
quigley77@gmail.com

*Attorneys for Plaintiffs*

*Appearance form filed July 24, 2024.

**CERTIFICATE OF COMPLIANCE**

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,847 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman for text and 12-point Times New Roman for footnotes) using Microsoft Word (the same program used for the word count).

/s/Pamela C. Spees
PAMELA C. SPEES

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that on July 24, 2024, this filing was

served via the Court's CM/ECF Document Filing System,

https://ecf.ca5.uscourts.gov, upon all registered CM/ECF users in this appeal.

/s/Pamela C. Spees
PAMELA C. SPEES